Dennis TIGUE, Appellant,

v.

T. J. SWAIM, Appellee.

No. 77–1349.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 17, 1977.
Decided Oct. 20, 1978.

R. David Lewis, Little Rock, Ark., for
appellant.

Fletcher Jackson, Asst. U. S. Atty., Little
Rock, Ark., argued, and W. H. Dillahunty,
U. S. Atty., on brief, for appellee.

Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and HUNTER, District Judge.*

HEANEY, Circuit Judge.

Dennis Tigue brought a diversity action against T. J. Swaim for libel and false imprisonment. Tigue was a captain in the Air Force, stationed at the Little Rock Air Force Base, when the events giving rise to this action occurred. Swaim was a colonel in the Air Force and Base Hospital Commander. The libel count was based on memoranda that Swaim sent to Dr. Frank Westerfield, a civilian psychiatrist, and to the Keesler Air Force Base Mental Ward. The false imprisonment count was based on an order from Swaim requiring Tigue to be confined in a mental hospital for evaluation. On March 21, 1977, the District Court, after a hearing, granted Swaim's motion for summary judgment and dismissed Tigue's complaint. It found that Swaim acted in good faith and without malice. It found, alternatively, that the acts and statements of Swaim were absolutely privileged under *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). On appeal, Tigue argues that Swaim is entitled to only a qualified immunity which protects only those acts undertaken in good faith, and that the District Court's finding of good faith was unjustified since there was evidence from which a jury could find bad faith and malice. We affirm.

While at the Little Rock Air Force Base, Tigue was asked to contribute one dollar each month to a fund used to purchase coffee mugs for departing officers. Contributions were also sought from all of the officers in Tigue's squadron. Tigue objected to this practice and expressed his desire to be left out of the program. Tigue's squadron commander, however, repeatedly asked Tigue for a contribution. He stated at an officers' meeting that Tigue was five months delinquent in his contributions. Tigue filed an administrative complaint with the Inspector General's office against his squadron commander alleging that these solicitations violated Air Force Standards of Conduct.[1] The response to this complaint, dated October 24, 1974, recommended that the practice be stopped. Tigue expressed his dissatisfaction with this response and requested that his complaint be forwarded to higher authorities.

Later that day, Tigue was summoned to the office of the base commander, Colonel O'Neil. O'Neil expressed unhappiness with Tigue's decision to forward the complaint. He said that it would give the impression that he was unable to deal with the problem at the local level. Tigue indicated that he would go forward with the complaint notwithstanding O'Neil's comments.

On October 31, 1974, Swaim, a neighbor of O'Neil, contacted Tigue. Swaim stated that O'Neil wanted Tigue scheduled for a mental evaluation pursuant to the Human Reliability Program (HRP). The purpose of the program is to select and keep only physically sound and emotionally stable personnel in a position to control, handle or launch nuclear weapons. It applies to those "individuals in, or working with, the Air Force * * * who are presently assigned, or selected to be assigned, to duties involving the control, handling, access to, or control over access to nuclear weapons and weapon systems." AFR 35–99, ¶ 1–1. Tigue was a missile maintenance officer and a member of a nuclear launch crew. He had been certified under the HRP. Swaim served as Medical Staff Advisor for the HRP. He was responsible for the initial screening, continual evaluation and treatment of those persons in the program. Swaim had the authority to investigate alleged mental or physical abnormalities and to remove from duty any person suspected of being "unreliable."

Swaim scheduled an appointment for Tigue with a Reserve psychiatrist for November 20, 1974. Tigue objected to the

1. The specific standard involved was AFR 30–30, which prohibits solicitations in any form for donations to a squadron fund.

evaluation since no reasons were given for it and he did not keep the appointment. On November 22, 1974, Swaim removed Tigue from the HRP for medical reasons.[2] While the record is unclear, it also appears that Tigue was removed from his duties with the missile squadron.

Tigue was given a psychiatric evaluation on November 25, 1974, by Lieutenant Lewis Wagaman, a social worker who reported to Swaim. Wagaman recommended that Tigue be further evaluated. The mental health clinic at the base then set up an appointment for Tigue with Dr. Wanda Stephens, a civilian psychiatrist, regularly used by the airbase to evaluate personnel. Swaim cancelled that appointment and arranged another one with Dr. Frank Westerfield, a retired colonel who graduated with Swaim from the University of Arkansas Medical School. Westerfield was not a doctor regularly used by the base. Swaim sent Westerfield a letter which contains the statements allegedly defaming Tigue.[3] Westerfield, however, was not given Tigue's medical file. Westerfield examined Tigue on November 30, 1974, but deferred diagnosis.

In his report to Swaim, Westerfield stated that Tigue was adjusting to a thyroid condition. Since emotional disruptions are common during such times, he recommended a ninety-day observation period. It appears that this was done to prevent an inaccurate diagnosis stemming from a temporary behavior pattern. Westerfield suggested further evaluation if Tigue displayed any emotional problems at the end of the observation period.

Westerfield's statement that Tigue was adjusting to a thyroid condition in November, 1974, was admittedly false. Tigue had been treated for hyperthyroidism during June of 1973. He was closely monitored during this period by Major Richard E. Bates, Chief of Medical Services, at the Little Rock Air Force Base. Bates stated, in a letter to Swaim dated March 6, 1974, that Tigue's physical status was normal after December, 1973, and that he displayed no symptoms of either hypo or hyperthyroidism. Swaim conceded at the hearing on the motion for summary judgment that Tigue had not demonstrated any evidence of thyroid problems after December, 1973.

In early March, 1975, Tigue was examined by Dr. Wanda Stephens pursuant to the original recommendation of Westerfield. She concluded that there was no reason why Tigue should be kept off of the HRP and questioned why the decision to remove him was made in the first place. She recommended a more thorough evaluation prior to reinstatement under the mistaken impression that Westerfield, rather than Swaim, had removed Tigue from the HRP.[4] The recommendation was made solely to give some deference to what Stephens thought was Westerfield's decision.

Tigue was ordered to Keesler Air Base for a complete mental evaluation on March 20, 1975. Swaim stated that he felt it was necessary to have the approval of the Air Force psychiatrist before Tigue was returned to the HRP. In conjunction with Tigue's evaluation at Keesler, Swaim prepared and forwarded a report that is also alleged to have libeled Tigue.[5] Tigue was

2. Swaim was required to notify O'Neil of the results of any medical evaluation. Swaim removed Tigue from the HRP after Tigue failed to keep his appointment since he was unable to complete the evaluation.

3. The letter stated that Tigue's immediate supervisor had suggested he see a psychiatrist, that Tigue had been having some recent job difficulties and that Tigue felt he had been maligned and his career ruined because of his thyroid condition.

4. It is unknown how Stephens received this impression, although Swaim sent her a memo

prior to Tigue's examination that was subsequently lost.

5. The report stated that Tigue had failed to progress in his career responsibilities as expected; that at least one supervisor had alleged that he was crazy; that questions of possible marital conflict, belligerent attitude and acting in a vengeful and hostile manner had been brought out during the past year; that a civilian psychiatrist, Dr. Frank Westerfield, recommended that he be removed from the HRP; and that he had some form of legal action pending against his commander.

confined in the mental ward at Keesler for twenty-two days. During this time, he was subjected to intense observation. The result of the evaluation was that Tigue suffered from no psychiatric disorder. The medical report noted that Tigue's current difficulties stemmed from his refusal to contribute a dollar a month to the officers' coffee mug fund and from his decision to pursue an administrative complaint against further solicitations. The report concludes with the prognosis that:

> [t]he patient is qualified for worldwide and stateside duty. The patient has no social or industrial impairment that would prevent him from ably carrying out his military duty. The patient is also qualified for the Human Reliability Program.

Tigue was subsequently restored to HRP status.

■■■ The District Court determined that summary judgment was appropriate because Swaim's actions were done in good faith and without malice. It erred in so doing. Summary judgment is appropriate only if the moving party can show that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). A court must view the facts most favorably to the party opposing the motion and give that party the benefit of any reasonable inferences to be drawn from the facts. *Unlaub Co., Inc. v. Sexton*, 568 F.2d 72, 76 (8th Cir. 1977); *Kelsey v. State of Minn.*, 565 F.2d 503, 506 (8th Cir. 1977). The facts clearly permitted the inference that Swaim punished Tigue for refusing to contribute to the coffee mug fund and filing complaints against his superiors.

The District Court, alternatively, held that summary judgment was appropriate because Swaim was entitled to absolute immunity from suit even if he acted in bad faith and with malice. The court stated, during the hearing, that military officers have absolute immunity if they act within the outer perimeters of their official duties. It also stated that even if absolute immunity did not exist for military officers in

general, that absolute immunity was required in this case where "the whole issue is the qualification of an officer to work in the highly sensitive area relating to nuclear power in terms of national defense."

The extent of Swaim's immunity in this action depends on the applicability of the recent decision of the Supreme Court in *Butz v. Economou*, —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In *Butz*, a commodity futures commission merchant brought suit against numerous Department of Agriculture officials following proceedings in which the Department sought unsuccessfully to revoke or suspend the registration of the merchant's company. The government argued that all of the federal officials were absolutely immune from any liability for damages even if, in the course of enforcing the relevant statutes, they infringed Economou's rights knowingly and deliberately. The Second Circuit had held that the federal officials were not entitled to absolute immunity but could claim only a qualified immunity based on good faith and reasonable grounds. *Economou v. U. S. Dept. of Agriculture*, 535 F.2d 688, 696 (2d Cir. 1976), *vacated*, —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). In reviewing this decision, the Supreme Court held:

> [I]n a suit for damages arising from unconstitutional action, federal executive officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer* [*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)], subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business.

*Id.* at ——, 98 S.Ct. at 2911, 57 L.Ed.2d at 916 (footnote omitted).

The Court had stated in *Scheuer v. Rhodes*, 416 U.S. 232, 247–248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), that

> in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably

appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

Swaim first argues that *Butz* is inapplicable to the facts of this case because *Butz* is limited solely to constitutional claims. He contends that federal officials remain entitled to absolute immunity if they are sued for common law torts, such as Tigue's claims for libel and false imprisonment. We assume, for purpose of this appeal, that this is a correct statement of the law.[6] We cannot, however, accept Swaim's second premise that Tigue's complaint is limited solely to common law violations. The complaint alleges sufficient facts to establish that Tigue was unlawfully deprived of liberty without due process of law when he was confined at Keesler Air Base for twenty-two days.[7] *See Alvarez v. Wilson*, 431 F.Supp. 136 (N.D.Ill.1977); *cf. Williams v. Brown*, 398 F.Supp. 155, 156 (N.D.Ill.1975).

Swaim also argues that even if *Butz* is applicable, he should be entitled to absolute immunity because such immunity is essential for effective operation of the military. He contends that there is a unique relationship between military personnel and their superiors that would be seriously disrupted if an individual could bring suit against his superior for orders given or acts committed in the course of military duty. He asserts that anything less than absolute immunity will seriously impair the ability of military officials to maintain order and discipline among their subordinates.

The Court, in *Butz*, stated that a qualified immunity from damages liability should be the general rule for executive officials charged with constitutional violations. *Butz v. Economou, supra* at ——, 98 S.Ct. 2894, 2910, 57 L.Ed.2d at 917. It felt that if federal officials were absolutely immune, "a suit under the Constitution could provide no redress to the injured citizen, nor would it in any degree deter federal officials from committing constitutional wrongs." *Id.* at ——, 98 S.Ct. at 2910, 57 L.Ed.2d at 915. Any decision to grant or deny absolute immunity necessarily involves balancing the harm to the individual citizen if he is unable to bring suit against the threat to effective governmental decision making if individual officers are liable for damages. In *Butz*, the Court determined that the risk of discouraging the vigorous exercise of governmental authority was usually outweighed by the harm to the individual citizen if he cannot bring suit for violations of his constitutional rights. It recognized, however, "that there are some officials whose special functions require a full exemption from liability." *Id.* at ——, 98 S.Ct. at 2895, 57 L.Ed.2d at 917.

■■■■■ In our view, we have no other alternative under *Butz* than to hold that

---

**6.** The Supreme Court's holding was limited to constitutional claims. *Butz v. Economou,* —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895, 908 n.22 (1978). The Second Circuit had already limited its holding in *Butz, Economou v. U. S. Dept. of Agriculture,* 535 F.2d 688 (2d Cir. 1976), *vacated,* —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), to constitutional claims. *See Huntington Towers, Ltd. v. Franklin Nat. Bank,* 559 F.2d 863, 870 n.2 (2d Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978). The Sixth Circuit has also interpreted *Butz* as applying only to allegations of constitutional violations. *See Granger v. Marek,* 583 F.2d 781, 784 (6th Cir. 1978). *See generally* Freed, *Executive Official Immunity for Constitutional Violations: An Analysis and a Critique,* 72 Nw.U.L.Rev. 526 (1978); Note, *Federal Officers—Scope of Immunity from*

*Damage Actions Available to Administrative Agency Officials—Economou v. United States Department of Agriculture,* 30 Rut.L.Rev. 209, 228–232 (1976). We need not decide this issue since we hold that under the more stringent *Butz* standard, Swaim is entitled to absolute immunity.

**7.** *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), established a cause of action against federal officials for injury to a constitutionally protected interest. The parties have not raised the issue of whether a *Bivens* action exists for such deprivations of liberty under the Fifth Amendment. We need not presently consider this issue. *See Butz v. Economou, supra* at ——, 98 S.Ct. 2894, 57 L.Ed.2d at 903 n.8.

military officers during peacetime are not automatically clothed with absolute immunity in every situation. *Butz* demands a particularized inquiry into the functions an official performs and the circumstances under which they are performed prior to the granting of absolute immunity.[8] *See Butz v. Economou, supra* at —, 98 S.Ct. 2894, 57 L.Ed.2d at 917–923. Whether they are so entitled depends on an analysis of the functions they perform, their immunity under common law and the interests sought to be protected. *See id.* at —, 98 S.Ct. 2894, 57 L.Ed.2d at 917; *Imbler v. Pachtman*, 424 U.S. 409, 421, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Thus, we cannot sustain the District Court's granting of summary judgment on the broad ground that all military officers, when acting within the scope of their duties, are immune from suit regardless of the functions they perform or the circumstances surrounding the performance.

■ We are, however, of the opinion that the District Court's more particularized ground for granting summary judgment is valid. It is clear that Swaim was acting pursuant to the HRP. As the Medical Staff Advisor for the HRP, he was responsible for the continuing evaluation of those in the HRP and was required to investigate any allegations of emotional instability made by an individual's commanding officer. It is also clear that the acts Tigue complains of stem from Swaim's decision to remove him from the HRP. Qualification under the HRP placed Tigue either actually or potentially in a position to control or handle a nuclear weapon. In light of his potential ability to deal with nuclear weapons, it is unnecessary to examine the nature of Tigue's actual duties at the time Swaim removed him from the HRP. In analyzing the circumstances surrounding the exercise of Swaim's authority, Tigue's inclusion in the HRP is the factor which assures us that national security interests are involved.[9]

We, thus, hold that in designating personnel as medically acceptable for inclusion under the HRP, Swaim was exercising a special function entitling him to absolute immunity. As Swaim's actions in removing Tigue from the HRP were admittedly done pursuant to this authority, it follows that Tigue may not bring suit against him.[10]

---

**8.** The immunity afforded state prosecutors under 42 U.S.C. § 1983 provides a useful analogy. A prosecutor whose activities are an integral part of the judicial process is entitled to absolute immunity from suit under § 1983. *See Imbler v. Pachtman*, 424 U.S. 409, 430–431, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Some Circuits have differentiated between the role of a prosecutor as an advocate and his role as an administrator or investigator. *Id.* These Courts have given only a qualified immunity to a prosecutor in situations where he functions merely in an investigatory role. *See, e. g., Guerro v. Mulhearn*, 498 F.2d 1249, 1256 (1st Cir. 1974); *Hampton v. City of Chicago, Cook County, Illinois*, 484 F.2d 602, 608–609 (7th Cir. 1973),*cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974). The Supreme Court has reserved this question. *Butz v. Economou, supra* at —, 98 S.Ct. 2894, 57 L.Ed.2d at 919 n.37.

**9.** A different situation would be presented if the HRP was not involved. It would then be necessary to examine Tigue's duties in order to determine if he in fact exercised any responsibility either in a decision to launch or the ability to control a nuclear weapon. Without a knowledge of such surrounding circumstances, we would be unable to decide whether national security interests were actually implicated.

**10.** Swaim also argues that the common law claims against him should be dismissed on the basis of *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and subsequent decisions extending its application. In *Feres*, the Supreme Court held that the United States was not liable under the Federal Tort Claims Act, 28 U.S.C. § 2674, for injuries to servicemen due to the negligence of government officials where the injuries arose out of or were in the course of activity incident to service. *Id.* at 146. *See Stencel Aero Eng. Corp. v. United States*, 431 U.S. 666, 669, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). Several courts have utilized the policies expressed in *Feres* to immunize military personnel from suit for service-connected injuries that they have inflicted, involving primarily medical malpractice and ordinary negligence. *See, e. g., Martinez v. Schrock*, 537 F.2d 765 (3d Cir. 1976), *cert. denied*, 430 U.S. 920, 97 S.Ct. 1339, 51 L.Ed.2d 600 (1977); *Hass v. United States*, 518 F.2d 1138 (4th Cir. 1975); *Bailey v. Van Buskirk*, 345 F.2d 298 (9th Cir. 1965), *cert. denied*, 383 U.S. 948, 86 S.Ct. 1205, 16 L.Ed.2d 210 (1966). *But see Jackson v. Kelly*, 557 F.2d 735 (10th

This is true even though Swaim revealed a singular lack of judgment in his dealings with Tigue.

The decision of the District Court granting Swaim summary judgment is affirmed.

Cir. 1977); *Henderson v. Bluemink*, 167 U.S. App.D.C. 161, 511 F.2d 399 (1974). Due to our disposition of this case, we need not decide this issue.