Keith FORSYTH, Appellee,

v.

Richard G. KLEINDIENST, Individually and as Attorney General of the United States, L. Patrick Gray, 3rd, Individually and as Acting Director, Federal Bureau of Investigation, John N. Mitchell, Individually and as former Attorney General of the United States, John Doe and Richard Roe, Albert Cooper and David Porter.

Appeal of John N. MITCHELL, E. Davis Porter, and Albert Cooper.

Katherine W. BURKHART, Judith Chomsky, Eva Gold, Dina Portnoy, Candy Putter, Joshua (Josh) Markel, Appellees,

v.

William SAXBE, Individually and as Attorney General of the United States, Clarence Kelley, Director, Federal Bureau of Investigation, John N. Mitchell, Individually and as former Attorney General of the United States, John Doe, and Richard Roe,

Appeal of John N. MITCHELL, Clarence Kelley, and William Saxbe.

Nos. 78–1611, 78–1847.

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1979.

Decided May 22, 1979.

David Rudovsky (argued), Kairys, Rudovsky & Maguigan, Philadelphia, Pa., for appellees.

Larry L. Gregg (argued), Gordon W. Daiger, Robert E. Kopp, Washington, D. C., for appellants.

Before HUNTER and WEIS, Circuit Judges, and MARKEY, Chief Judge, Court of Customs and Patent Appeals.*

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This appeal is a consolidation of two related actions before different district court judges in the Eastern District of Pennsylvania.[1] The actions involve identical issues, virtually identical defendants and have overlapping records. The defendants, former Attorneys General of the United States, a former Director of the Federal Bureau of Investigation, and agents of the Federal Bureau of Investigation, appeal from the denial of their motions for summary judgment. First, the defendants contend that both district courts erred in holding that the defendants are not entitled to absolute immunity. Alternatively, the defendants contend that the district courts erred in not granting them qualified immunity as a matter of law.

We conclude that the district courts' denials of defendants' motions for summary judgment on the issue of absolute immunity are appealable at this time under the collateral order doctrine. Both *Forsyth* and *Burkhart* will be remanded to the respective district court to apply the test developed in this opinion to the facts of each case. On the defendants' contention that they are, in any event, entitled to qualified immunity as a matter of law, we hold that the denial of the motion for summary judgment on this issue is not a final judgment and is, therefore, not appealable at this time. Finally, we reject the individual FBI agents' contention that they are entitled to derivative absolute immunity.

### I.

These cases arise out of warrantless electronic surveillances authorized by the Attorney General and executed by FBI agents in the early 1970's. The wiretaps resulted in the overhearing of telephone conversations between the plaintiffs and members of organizations under investigation. The plaintiffs were not themselves under investigation.

### Forsyth

Plaintiff Keith Forsyth was overheard through a tap directed against William Davidon, a professor at Haverford College, who was allegedly associated with the East Coast Conspiracy to Save Lives (ECCSL). The Philadelphia FBI office learned in June, 1970 that the ECCSL was planning to protest the Vietnam War by destroying underground utility tunnels in Washington, D.C. The FBI also had information that the ECCSL had been responsible for several raids on draft board offices. In August, 1970 the government obtained copies of letters written by Father Phillip Berrigan and Sister Elizabeth McAlister which indicated that three people, including Professor Davidon, had discussed the possibility of kidnaping National Security Advisor Henry Kissinger. On November 6, 1970, after additional investigation, Attorney General John Mitchell authorized the FBI to place a wire-

---

* Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, Washington, D. C., sitting by designation.

1. *Forsyth v. Kleindienst* is reported at 447 F.Supp. 192 (E.D.Pa.1978). *Burkhart v. Saxbe* is found at 448 F.Supp. 588 (E.D.Pa.1978).

tap on the telephone of Professor Davidon. The tap continued with one extension until January 6, 1971. According to FBI Special Agent Fields, the purpose of the tap was primarily to gather intelligence information, although it was anticipated that information of a criminal evidentiary nature might also be obtained. The monitoring agents were instructed to record all conversations unless it was known that one of the parties to the conversation was a defendant in a federal criminal case or was an attorney for a criminal defendant. No other instructions were given to minimize the scope of the interceptions. Forsyth was overheard on three occasions.

Forsyth sued for damages under the first, fourth, sixth, and ninth amendments to the Constitution, and under 18 U.S.C. § 2520 (1976).[2] After discovery, including the deposing of defendant Mitchell, both sides moved for summary judgment. On February 14, 1978 the district court denied the motions for summary judgment. First, the court held that the defendants were not entitled to absolute immunity. Second, it held that there was a genuine dispute over material facts which precluded summary judgment on the issue of qualified immunity. *See* Fed.R.Civ.P. 56(c).

### Burkhart

Plaintiffs in *Burkhart* were overheard on both the Davidon tap and a tap directed against the Black Panther Party. The Black Panther tap was originally authorized on June 1, 1970 and continued until February 10, 1971. Two reauthorizations in the interim were required because phone service to the Black Panther party headquarters was terminated and the headquarters moved to a new location. Attorney General Mitchell stated in an affidavit that he authorized the Black Panther tap because he had information that the Party had made foreign "contacts . . . for the purpose of obtaining foreign funds to support Black Panther revolutionary activities, including the advocacy of the violent overthrow of existent Federal and state government structures."

Plaintiffs in *Burkhart* also sued for damages for violations of their rights under the first, fourth, sixth, and ninth amendments to the Constitution, and under Title III of the Omnibus Crime Control and Safe Streets Act of 1968. *See* note 2 *supra.* The district court first denied the defendants' claims of absolute immunity in July, 1975. *Burkhart v. Saxbe,* 397 F.Supp. 499 (E.D. Pa.1975). Later cross motions for summary judgment were filed, and argument was heard jointly with that in *Forsyth.* The district court denied both sides' motions for summary judgment on March 21, 1978. As in *Forsyth,* the *Burkhart* court found material questions of fact in dispute which precluded summary judgment on the issue of qualified immunity. Also, it refused to reverse its earlier decision denying the defendants' motion to dismiss on the issue of absolute immunity.

Plaintiffs in both actions rely on *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), (*Keith*), to establish a violation of their fourth amendment rights. There, the

**2.** Section 2520 of Title 18 (1976) provides a private cause of action and damages for violations of Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Wire Interception and Interception of Oral Communications). 18 U.S.C. §§ 2510–2520 (1976). It provides:

Recovery of civil damages authorized
Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recovery from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
(b) punitive damages; and
(c) a reasonable attorney's fee and other litigation costs reasonably incurred.
A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

Supreme Court held that the fourth amendment requires that a warrant be obtained before engaging in surveillance of a domestic organization, even if the domestic organization threatens national security. In the context of this case, we have no occasion to review the district courts' holdings that the wiretaps authorized here were unconstitutional under *District Court.* Nor will we address the district courts' holdings that *District Court* is to be given retroactive effect. The sole issue before us is whether the defendants are entitled to absolute immunity.

## II.

 Initially, we are presented with the plaintiffs' contention that we lack appellate jurisdiction to review the district courts' denials of defendants' motions for summary judgment. Generally, the denial of a motion for summary judgment is not appealable. *Hart v. Overseas National Airways, Inc.,* 541 F.2d 386, 394 (3d Cir. 1976). Nevertheless, defendants contend that we have appellate jurisdiction under the final judgment rule, 28 U.S.C. § 1291 (1976).[3] As early as 1949 the Supreme Court in *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1226, 93 L.Ed. 1528 (1949), emphasized that section 1291 must be given a "practical rather than a technical construction." Under the *Cohen* collateral order doctrine, appellate courts have jurisdiction over orders which "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546, 69 S.Ct. at 1225–1226. The Supreme Court in *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), summarized the three requirements of *Co-*

*hen.*[4] To be appealable a district court's order must 1) conclusively determine the disputed question; 2) resolve an important issue completely separate from the merits of the action; and 3) be effectively unreviewable on appeal from a final judgment. *Id.* at 468–69, 98 S.Ct. 2454. *See also United States v. MacDonald,* 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978) (district court's order denying motion to dismiss indictment because of alleged violation of sixth amendment rights to speedy trial not appealable before trial).

The district courts' denials of the defendants' motions for summary judgment on absolute immunity must be analyzed under these three standards. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), is closely analogous to our case. There, the Supreme Court addressed the question of whether a pretrial order denying defendants' motion to dismiss on the ground of double jeopardy is a final order under section 1291. In finding appealability, the Court stressed particularly the third of the three *Cohen* factors—that the district court's decision involved an important right which would be lost if appellate review had to await adjudication on the merits. And, in characterizing the right which the defendant would lose absent immediate review, the Court noted: "[The defendant] is contesting the very authority of the Government to hale him into court to face trial on the charge against him. . . . The elements of that claim are completely independent of his guilt or innocence." *Id.* at 659–60, 97 S.Ct. at 2040.

 We agree with the defendants' argument that the rights protected by the double jeopardy clause and the doctrine of absolute immunity are similar. The underlying purpose of each is to grant the defendant the right not to be subjected to trial, not just the right not to be found guilty. A

---

3. Section 1291 of Title 28 (1976) provides in part:

　　The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . except where a direct review may be had in the Supreme Court.

4. In *Livesay* the Court applied the *Cohen* collateral order doctrine to determine that the denial of a motion for class certification is not appealable under 28 U.S.C. § 1291 before trial.

case quite similar to that before us is *Briggs v. Goodwin,* 186 U.S.App.D.C. 179, 569 F.2d 10 (1977) (Wilkey, J. writing for the majority on the issue of appealability), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). There, the court considered the appealability of the denial of a defendant's motion to dismiss because he was, as a witness in a criminal proceeding, absolutely immune from prosecution under the doctrine of quasi-judicial immunity. In finding appellate jurisdiction the court, also stressing the third of the three *Cohen* criteria, noted that the purpose of absolute immunity is "as much to protect the relevant persons from a trial on their actions as it is to protect them from the outcome of trial." *Id.* at 59. The court interpreted *Abney* as formulating the following test: "whether the relevant rights that were the subject of the pretrial order would be 'significantly undermined' if appellate review had to await final action in the case." *Id. See also McSurely v. McClellan,* 172 U.S.App.D.C. 364, 521 F.2d 1024, 1032 (1975), *en banc,* 180 U.S.App.D.C. 101, 553 F.2d 1277 (1976), *cert. dismissed as improvidently granted,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978) (on appeal from denial of motion to dismiss for absolute immunity under the Speech & Debate Clause, "the question of appealability does not turn on the correctness of an appellant's claim[s]").

 Furthermore, defendants here are not precluded from relying on the collateral order doctrine merely because they were unsuccessful in their attempts to have the question of absolute immunity certified under 28 U.S.C. § 1292(b) (1976).[5] A section 1292(b) motion was filed in each action: the motion was denied in *Burkhart* and was not ruled upon in *Forsyth.* Simply stated, the collateral order doctrine and section 1292(b) serve different goals. Section 1292(b) per-

mits the district court to certify an order to the appellate court if the court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Thus, institutional efficiency is a major purpose of the certification provision. *Milbert v. Bison Laboratories, Inc.,* 260 F.2d 431, 433 (3d Cir. 1958) (used in exceptional cases where an intermediate appeal would avoid protracted and expensive litigation). *Accord, Kraus v. Board of County Road Commissioners for Kent County,* 364 F.2d 919, 922 (6th Cir. 1966) (purpose to avoid protracted and expensive litigation); *E. F. Hutton & Co. v. Brown,* 305 F.Supp. 371, 402–03 (D.C.Tex.1969) (purpose to shorten time, effort, and expense exhausted between filing of lawsuit and its termination). A central goal of the collateral order doctrine, however, is to prevent the loss of rights merely because appellate review is delayed until the litigation has run its full course in the lower court. As noted in *Briggs,* "[s]ince the discretion of the trial judge whether to certify is itself unreviewable, the value of immediate review in the 'small class' of cases where it is warranted under the collateral order doctrine could be irretrievably lost if [the] view that denial of certification *per se* bars interlocutory review were to prevail." 569 F.2d at 60.

 We hold that the denial of the defendants' motions for summary judgment on the issue of absolute immunity is appealable under the *Cohen* collateral order doctrine. Appellate review at this time will conclusively determine the disputed question and will resolve an important issue completely separate from and collateral to the question of the defendants' guilt or

---

**5.** Section 1292(b) of Title 28 (1976) provides in part:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immedi-

ate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order:
. . . .

innocence. Moreover, the denial of absolute immunity is effectively unreviewable on appeal. Since the right which absolute immunity protects is the right not to be subjected to trial, it is irretrievably lost if appellate review must await final adjudication on the merits. *See McSurely v. McClellan,* 172 U.S.App.D.C. 364, 521 F.2d 1024 (1975), *en banc,* 180 U.S.App.D.C. 101, 553 F.2d 1277 (1976), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

Finally, we reject the defendants' suggestion that we take this opportunity to review the district courts' denials of their motions for summary judgment on the issue of qualified immunity. The Supreme Court in *Abney,* while upholding appellate jurisdiction over the double jeopardy claim, concluded that an appellate court lacked jurisdiction over the defendant's accompanying contention that the district court erred in refusing to dismiss the indictment for failure to state an offense. The Court held that "such claims are appealable if, and only if, they too fall within *Cohen's* collateral-order exception to the final-judgment rule." 431 U.S. at 663, 97 S.Ct. at 2042. Though the defendants may ultimately prevail on the issue of qualified immunity, they do not seriously contend that the denials of their motions for summary judgment on that issue are appealable under the three requirements of *Cohen.*

### III.

We are presented, then, with the defendants' contention that they are entitled to absolute immunity. We recognize, as did

the defendants, that the availability of absolute immunity to the individual agents who executed the surveillances may rest on different considerations from those urged by former Attorney General Mitchell.[6] Thus, we analyze the two problems separately.

Former Attorney General Mitchell contends that he is absolutely immune from civil liability for his decision to authorize the warrantless electronic surveillances. As the head of an executive agency, the Department of Justice, he argues that he should not be held liable for what he characterizes as an error in judgment. His argument stresses that the wiretaps which gave rise to these suits occurred in 1970 and 1971, but that the Supreme Court did not definitely decide until 1972 that the warrantless electronic surveillance of domestic organizations violated the fourth amendment. *See United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). He argues that his only error was a failure to predict accurately what the Supreme Court would later hold. Also, he directs us to the possibility of harassing lawsuits which he contends would hamper the effective discharge of the duties of the Attorney General if we were to hold that he is not entitled to absolute immunity.

The Supreme Court considered the scope of immunity for the heads of federal executive agencies in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). There, Economou brought suit

---

**6.** We have omitted from our discussion any mention of the defendants who were high level federal officials other than former Attorney General Mitchell. In *Forsyth* the district court dismissed the claims against defendants former Attorney General Richard G. Kleindienst and former Director of the FBI L. Patrick Gray. Plaintiffs have not challenged the dismissal.

In *Burkhart* two of the defendants, former Attorney General William Saxbe and former Director of the FBI Clarence Kelley, have apparently not been formally dismissed. However, neither Saxbe nor Kelley was in office at the time the surveillances occurred. *Burkhart* noted that there is no basis for holding them liable for violating the fourth amendment rights

of the plaintiffs. Plaintiffs are left only with a claim against Saxbe and Kelley for illegal use or disclosure of the taped material, an offense arising under 18 U.S.C. § 2520. *See* note 2 *supra.* On these issues, the district court stated: "Defendants, Saxbe and Kelley, having taken office subsequent to the termination of the wiretaps in question and there being no support on the record for plaintiffs' allegations of use and disclosure, I see no basis for holding these defendants liable." 448 F.Supp. at 607 (footnote omitted). Because of their uncertain status, we do not discuss them individually. We note, however, that the principles developed by this opinion would apply equally to them.

against a number of officials in the Department of Agriculture. The corporation which the plaintiff controlled, Arthur N. Economou and Co., had been registered with the Department of Agriculture as a commodity futures commission merchant. The Department sought to revoke the registration, contending that the plaintiff had failed to maintain the required financial reserve. A hearing was held, and the Chief Hearing Examiner sustained the administrative complaint. His decision was affirmed by the Department's Judicial Officer. Economou contended that the administrative proceeding had been initiated in retaliation for his sharp criticism of the Commodity Exchange Authority. He sought damages against several officials in the Department of Agriculture—including the Secretary, the Judicial Officer, the Chief Hearing Examiner, and the Department attorney who had presented the Department's objections—for violations of his due process and first amendment rights. The district court granted the defendants' motion to dismiss on the ground of absolute immunity, and the Second Circuit reversed, reasoning that *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), established that officials of the executive branch exercising discretionary functions would be adequately protected by only a qualified immunity.

The Supreme Court reversed. While remanding for further proceedings, the Court held that the Secretary, and the other Agriculture Department officials involved in the administrative proceeding, might be entitled to absolute immunity from suit. The Court first distinguished *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and in the process, cut much of the force out of the Attorney General's argument here. The defendant in *Barr,* the acting director of an executive agency, claimed absolute immunity from a malicious defamation suit brought by two former employees. The Supreme Court's plurality opinion held that the official was absolutely immune since the issuance of the defamatory press release was "within the outer perimeter of [the defendant's] line of duty"

and was "an appropriate exercise of the discretion which an officer of that rank must possess if the public service is to function effectively." 360 U.S. at 575, 79 S.Ct. at 1341. The Court succinctly stated its rationale for granting absolute immunity:

> It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties— suits which would consume time and energies which would otherwise be devoted to government service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

*Id.* at 571, 79 S.Ct. at 1339. In balancing the deprivation to the individual denied a remedy against the interest of governmental efficiency, the Court recognized that "there may be occasional instances of actual injustice which will go unredressed, but we think that price a necessary one to pay for the greater good." *Id.* at 576, 79 S.Ct. at 1342.

The plaintiffs in *Barr* alleged defamation, a cause of action arising under state tort law; in *Butz,* the Court was presented with allegations of constitutional deprivations. This distinction, in the Supreme Court's view, was crucial:

> [W]e are confident that *Barr* did not purport to protect an official who has not only committed a wrong under local law, but has also violated those fundamental principles of fairness embodied in the Constitution. Whatever level of protection from state interference is appropriate for federal officials executing their duties under federal law, it cannot be doubted that these officials, even when acting pursuant to congressional authorization, are subject to the restraints imposed by the Federal Constitution.

98 S.Ct. at 2905 (footnote omitted). Thus, the considerations central to the result in *Barr*—the need to protect an official exercising his discretion and the need to limit harassing suits which would impair the vigorous discharge of his duties—are insuffi-

cient to justify the grant of absolute immunity to high officials of executive agencies when violations of federal constitutional law, as opposed to state tort law, are asserted.

Having distinguished *Barr v. Matteo,* the Supreme Court looked to *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), to supply the governing legal principles. There it had confronted the scope of immunity available to a state governor sued under 42 U.S.C. § 1983 for suppressing a civil disturbance in an unconstitutional manner. *Butz* characterized *Scheuer* as resolving the problem of "how best to reconcile the plaintiff's right to compensation with the need to protect the decision making processes of an executive department." The result of the balance in *Scheuer* was to grant the state governor only a qualified, or good faith, immunity from suit.[7] *Butz* extended *Scheuer* to provide the general rule for federal officials as well.[8]

*Butz* and *Scheuer* undermine the Attorney General's policy arguments here. First, he contends that his prediction that warrantless electronic surveillance would not be held to violate the fourth amendment was essentially a discretionary act for which he should not be held liable. We have noted, however, that *Barr's* holding that federal officials exercising discretionary functions are absolutely immune from suit under state tort law does not apply in the face of allegations of constitutional deprivations. The *Butz* Court balanced the competing considerations: *"Scheuer* and other cases have recognized that it is not unfair to hold liable the official who knows or should know he is acting outside the law, and that

insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." 98 S.Ct. at 2911. More fundamentally, the Attorney General's justification that the law was unsettled when he authorized the warrantless surveillance does not distinguish between absolute and qualified immunity. If he can establish that the law was unsettled, and that he acted without malice, he will prevail on his claim of qualified immunity. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See also* note 7 *supra.* As we have stressed, the question before us is not ultimate liability; rather it is whether the Attorney General should be protected even from the burden of defending himself at trial.

Second, the Attorney General contends that he is entitled to absolute immunity because a lesser level of protection would permit an Attorney General to be subject to frivolous, harassing lawsuits which would chill the vigorous discharge of his duties. *Butz,* however, was unconcerned with this problem. The Court noted that "[i]nsubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading" and that "firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." 98 S.Ct. at 2911.

### IV.

■ The Supreme Court in *Butz* held that "in a suit for damages arising from unconstitutional action, federal executive

---

7. The Supreme Court defined "good faith" for the purposes of establishing qualified immunity from a suit based on § 1983 in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). The Court held that an official would not be immune from liability if he knew or should have known that the action he took would violate the constitutional rights of the plaintiff, or if he took the action with the malicious intention to cause a deprivation. *Id.* at 322, 95 S.Ct. 992.

8. The *Butz* Court reasoned:

The constitutional injuries made actionable by § 1983 are of no greater magnitude than those for which federal officials may be responsible. The pressures and uncertainties facing decisionmakers in state government are little if at all different from those affecting federal officials. . . . Surely, *federal* officials should enjoy no greater zone of protection when they violate *federal* constitutional rules than do state officers.
98 S.Ct. at 2908 (emphasis in original).

officials exercising discretion are entitled only to the qualified immunity specified in *Scheuer*, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." 98 S.Ct. at 2911. We read the holding as placing a heavy burden on the defendants to demonstrate a need for protection greater than that provided by qualified immunity.[9] As our starting point we must undertake "a considered inquiry into the immunity historically accorded the relevant official at common law and the interests behind it." *Id., quoting Imbler v. Pachtman*, 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976).

In *Imbler* the Supreme Court granted absolute immunity to a state prosecutor from a suit under 42 U.S.C. § 1983 charging him with the knowing use of perjured testimony. The plaintiff contended that the state prosecutor could not, as a member of the executive branch, claim quasi-judicial absolute immunity. The Supreme Court rejected the plaintiff's argument. It stated that its earlier decisions on section 1983 immunities did not rest solely on the branch of government in which the defendant worked. 424 U.S. at 421, 96 S.Ct. 894. After determining that a prosecutor was entitled at common law to absolute immunity from suit, the Court examined the common law rule in light of section 1983. In upholding the grant of absolute immunity, it noted that a state prosecutor would be particular-

ly unable to defend himself from a potential flood of section 1983 suits; that the ultimate fairness of the criminal justice system might be upset by subjecting prosecutors to suit; and that the inherent independence of the judicial system provides procedures to check excessive prosecutorial zeal and determine whether the accused has received a fair trial. 424 U.S. at 425–28, 96 S.Ct. 894.

The Attorney General here relies on *Imbler*. He analogizes his position to that of a state prosecuting attorney, and argues that because their positions are similar, he too should be entitled to the shield of absolute immunity. The Attorney General's claim to absolute immunity, therefore, is measured by that extended to the state prosecutor in *Imbler*. We search, then, for the boundaries to that immunity.

At the outset, the Attorney General cannot effectively contend that his functions are coextensive with those of a prosecuting attorney. Though as a shorthand expression he has been called the nation's "chief prosecuting attorney," his duties and responsibilities are far greater than those of the ordinary prosecutor.[10] The distinction is important because the Supreme Court in *Butz* and *Imbler* intended a functional test rather than one based on status or title.[11] *Butz* particularly stressed the need to make an inquiry into the particular decision challenged to determine whether an official is entitled to absolute immunity. There, the Secretary of Agriculture had the statutory

**9.** The Court in *Butz* noted:
Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: . . . In light of this principle, federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.
98 S.Ct. at 2910–2911.

**10.** For example, the Attorney General is charged with the duty of giving legal advice to the President, 28 U.S.C. § 511 (1976); to the heads of other executive departments, *id.* at § 512; and to the Secretaries of military departments, *id.* at § 513. His purely administrative duties range from providing for the publication and distribution of his opinions, *id.* at § 521, to appropriating money for the meals

and lodging of bailiffs, *id.* at § 524. Moreover, the Federal Bureau of Investigation is within the Department of Justice, *id.* at § 531. And, the Attorney General has the power to appoint officials to detect and prosecute crimes against the United States and to conduct other investigations regarding official matters under the control of the Department of Justice, *id.* at § 533.

**11.** The Eighth Circuit in *Tigue v. Swaim*, 585 F.2d 909 (8th Cir. 1978), similarly read *Butz* as demanding a functional approach: "*Butz* demands a particularized inquiry into the functions an official performs and the circumstances under which they are performed prior to the granting of absolute immunity," not merely an inquiry into the status or title of the official claiming the protection.

power to initiate proceedings whenever he had reason to believe that a person had violated the statute or the rules, regulations, or orders of the Secretary of Agriculture or the Commission. 7 U.S.C. § 9.[12] The Court noted that "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." 98 S.Ct. at 2915. In granting the Secretary absolute immunity over the decision to institute administrative proceedings, the Court held: "agency officials performing certain functions analogous to those of a prosecutor should be able to claim absolute immunity *with respect to such acts." Id.* (emphasis supplied) [13]

■ *Imbler v. Pachtman,* as well, utilized a functional approach. It suggested that even a prosecuting attorney would not be absolutely immune from suit for actions which are not closely connected with the judicial process. The Supreme Court's holding was narrow: "We hold only that in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995. The Court emphasized that the prosecutor's activities "were intimately associated with the judicial phase of the criminal process," and therefore, were "functions to which the rea-

sons for absolute immunity apply with full force." *Id.* at 430, 96 S.Ct. at 995. While leaving open the question of whether a prosecutor is entitled to absolute immunity for other actions, Justice Powell made the following comments:

We recognize that the duties of the prosecutor in his role as an advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom. . . . These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33.

Cases in other circuits both before and after *Imbler* have distinguished between a prosecutor's quasi-judicial functions on the one hand and his investigative and adminis-.

---

**12.** The statute has since been amended to provide that the Commission, and not the Secretary, has the power to initiate proceedings. 7 U.S.C. § 9, *as amended by* Act of Oct. 23, 1974, Pub.L.No.93–463, 88 Stat. 1392.

**13.** The Attorney General urges that an important factor in the *Butz* decision to grant absolute immunity against a suit challenging a decision by the Secretary to initiate the administrative proceeding was the existence of checks, other than private damages actions, on the Secretary's conduct. Thus, in *Butz* the Court stressed that "legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency zeal." 98 S.Ct. at 2916. More generally, "the safeguards built into the judicial process tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct." 98 S.Ct. at 2914. The Attorney General argues that there are sufficient checks on his decision to authorize warrantless electronic wiretaps that

he, too, should be immune from private remedy. He points out that the Attorney General is an officer of the court, subject to professional discipline, and that Congress has the power to overturn his judicial interpretations.

We are not necessarily persuaded by the Attorney General's argument. The checks to which he directs our attention are not analogous to the multitude of independent checks and safeguards operating inherently, without the need of special invocation, in the judicial system. It is because of the "features of the judicial process" that "there is a less pressing need for individual suits to correct constitutional error." *Butz,* 98 S.Ct. at 2914. The plaintiffs here were not the subjects of criminal investigations. If they are denied an opportunity to present their case by the doctrine of absolute immunity the defendants' allegedly unconstitutional conduct may never be subject to judicial scrutiny in any forum.

trative functions on the other, granting absolute immunity to the former and relegating the latter to qualified immunity. In *Apton v. Wilson*, 165 U.S.App.D.C. 22, 506 F.2d 83 (1974), plaintiffs contended that the Attorney General, other high ranking Department of Justice officials, and members of the District of Columbia Police Department violated their fourth amendment rights. Specifically, plaintiffs complained that they were detained without probable cause during the May Day demonstrations in 1971. The D.C. Circuit held that the Attorney General was not entitled to absolute immunity for his part in directing the May Day police activity. The Court reasoned that "the absolute immunity often accorded prosecuting attorneys cannot shield the defendants in this case, for the prosecutor's absolute protection, like that of the judge from which it is derived, is both justified and bounded by the judicial traditions and procedures that limit and contain the danger of abuse." *Id.* at 93 (footnotes omitted). The court held that in the course of directing police investigative activity, the Attorney General would not be entitled to absolute immunity. *See Guerro v. Mulhearn*, 498 F.2d 1249 (1st Cir. 1974) (absolute immunity does not relate to acts done in the prosecutor's investigatory role); *Hampton v. City of Chicago*, 484 F.2d 602 (7th Cir. 1973), *cert. denied*, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (states attorney not absolutely immune for planning and executing illegal raid); *McCray v. Maryland*, 456 F.2d 1 (4th Cir. 1972); *Dodd v. Spokane County, Washington*, 393 F.2d 330, 335 (9th Cir. 1968). *See also Jennings v. Shuman*, 567 F.2d 1213, 1221 & n. 15 (3d Cir. 1977), which questions the correctness of the scope of immunity afforded in *Briggs*

*v. Goodwin*, 186 U.S.App.D.C. 179, 569 F.2d 10, 19–20 (1977), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

This court has not been squarely presented with the problem of the scope of immunity for prosecutorial conduct which lies outside of the advocatory function but within a prosecutor's duties as an administrator or investigator. In *Brawer v. Horowitz*, 535 F.2d 830 (3d Cir. 1976), we were confronted with plaintiff's contentions that a federal prosecutor had knowingly used perjured testimony. We held: "[A] federal prosecutor is absolutely immune from suit where the allegations relate solely to his initiating and presenting a criminal case. The allegations of the complaint implicating [the defendant-federal prosecutor] all related to his actions in his role as an advocate, rather than as an administrator or investigator." *Id.* at 834, *citing Imbler v. Pachtman*, 424 U.S. at 431 & n. 33, 96 S.Ct. 984. In *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir. 1977), this court in a per curium opinion considered the immunity available to a federal prosecutor against a suit alleging that he deliberately leaked false information about the plaintiff to damage the plaintiff's political prospects. While finding it unnecessary to decide whether absolute immunity protects a U.S. Attorney's administrative and investigative functions, we held that for some conduct a prosecutor may only be entitled to only qualified immunity: "It would appear that [the deliberate leaking of false information], if it occurred would lie outside of the rationale for absolute immunity set forth in *Imbler.*" *Id.* at 566.

Thus, the advocatory/investigative distinction has been cited with approval in this court.[14] We hold that where the activities

---

14. Defendants contend that this court rejected the advocatory/investigative distinction in *Cambist Films, Inc. v. Duggan*, 475 F.2d 887 (3d Cir. 1973). There, a state prosecuting attorney was sued for his actions in investigating a violation of the laws of Pennsylvania. The court, granting the prosecutor absolute immunity, held: "Obviously, this case in no way approaches the 'clear absence of jurisdiction' standard required for possible liability on the part of the prosecutor." *Id.* at 889. We distinguish *Cambist* on two grounds. First, *Cambist*

involved a common law tort action. Any statement on the scope of immunity from allegations of constitutional deprivations is only dicta in that opinion. Second, *Cambist* cites *Robichaud v. Ronan*, 351 F.2d 533 (9th Cir. 1965), as defining the distinction between "excess of jurisdiction" and "complete absence of jurisdiction." *Robichaud*, however, stands squarely for the proposition that:

[W]hen a prosecuting attorney acts in some capacity other than his quasi-judicial capacity, then the reason for his immunity—inte-

of the Attorney General depart from those which cast him in his quasi-judicial role, the protection of absolute immunity will not be available. *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir. 1977).

■ Justice Powell noted in *Imbler* that drawing the line between protected and unprotected conduct will be difficult. 424 U.S. at 431 n. 33, 96 S.Ct. 984. This case, dealing essentially with investigative activity, is within that gray area. We recognize that the decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made. To grant a prosecuting attorney absolute immunity over his decision to initiate a prosecution while subjecting him to liability for securing the information necessary to make that decision would only foster uninformed decisionmaking and the potential for needless actions. We believe that the right to make the decision without being subject to suit must include some limited right to gather necessary information. At the same time, we are sensitive to the possibility that this narrow exception could be distorted to include all of a prosecutor's investigative activities. We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal

prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.

### V.

■ Our reading of *Butz* and *Imbler* leads us to the conclusion that the Attorney General's decision to authorize the warrantless electronic surveillances is protected by the shield of absolute immunity when it is made in the context of a quasi-judicial function; however, when the decision arises in the context of a purely investigative or administrative function, the decision will not be protected by absolute immunity.[15] We foresee that a limited factual inquiry may in some cases be necessary to determine in what role the challenged function was exercised. We recognize that this may result in some dilution of the protection of absolute immunity. However, this approach is necessary to protect fully the government official performing a protected function; at the same time, we must permit a private remedy to those whose constitutional rights were violated by an official acting outside of the scope of absolute immunity.[16]

In *Forsyth* the district court found that "in authorizing the warrantless wiretap in this case, the Attorney General was functioning as an administrator rather than as an officer of the court," and denied the

gral relationship between his acts and the judicial process—ceases to exist. If he acts in the role of a policeman, then why should he not be liable, as is the policeman, if in so acting, he has deprived the plaintiff of rights, privileges, or immunities secured by the Federal Constitution and laws?

351 F.2d at 536. *See also Bauers v. Heisel*, 361 F.2d 581, 591 (3d Cir. 1966), *cert. denied*, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967).

**15.** In language which may bear on the resolution of this issue, the Supreme Court in *Butz* pointed out:

It makes little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct.

98 S.Ct. at 2910.

**16.** Plaintiffs have also asserted a cause of action under 18 U.S.C. § 2520 (1976) for illegal interception of wire communications. *See* note 2 *supra*. Defendants' claim of absolute immunity for violations of federal statutory law certainly can fare no better than their claim for immunity against constitutional torts.

Moreover, defendants can find no aid in the statute itself. It provides: "A good faith reliance on a . . . legislative authorization shall constitute a complete *defense* to any civil . . . action brought under this chapter . . . .." (emphasis supplied) The greatest scope of protection which the defendants could derive from the words of the statute is a qualified, or good faith, immunity. *See Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 516 F.2d 594 (1975) (en banc), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

claim of absolute immunity. 447 F.Supp. at 201. However, the court has provided us with no statement of the reasons for its decision that the authorization of the warrantless wiretaps in this case falls within the Attorney General's administrative function. As we have noted, if the decision to authorize the wiretaps was made by the Attorney General in an attempt to secure information to determine whether to initiate a criminal prosecution, then he is entitled to absolute immunity from suit challenging that decision. Without a statement of the district court's analysis, we are unable to determine whether the Attorney General's conduct meets that test. Therefore, we must remand to the district court for additional consideration. In *Burkhart*, the district court initially ruled on the immunity issue by denying defendants' motion to dismiss or, in the alternative, for judgment on the pleadings. The court found it sufficient that the plaintiffs had made allegations that the Attorney General had authorized the wiretaps in the course of supervising an investigation. 397 F.Supp. at 503 n. 4. Later, on a motion for summary judgment, the district court refused to reconsider its earlier decision denying the motion to dismiss on the ground of absolute immunity. 448 F.Supp. at 608 n. 33. The opinion does not disclose, however, whether the court made any inquiry into the circumstances surrounding the authorization. Therefore, we must remand *Burkhart*, as well, to the district court for an initial determination on the availability of absolute immunity in light of the evidence developed.

## VI.

Finally, we must deal with the contention of the individual FBI agents that they are entitled to absolute immunity from suit for conducting the electronic surveillances. They argue that they are entitled to absolute immunity from suit derivatively from the absolute immunity accorded to the Attorney General. Further, they argue that they were merely following the orders of their superior and should not be put to the test of either disobeying authority or being subject to liability.

Their argument is not persuasive. In *Johnson v. Alldredge*, 488 F.2d 820 (3d Cir. 1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), this court rejected the concept of derivative absolute immunity. There, we held that a prison warden was absolutely immune from suit.[17] However, we granted the prison guards only qualified immunity, even though they were merely implementing the policies formulated by the warden. *Johnson* again demonstrates that a decision on the scope of immunity depends on the functions performed by the particular official. Derivative absolute immunity would be inconsistent with that approach.

■■■ *Butz* places a heavy burden on the official claiming absolute immunity to demonstrate "exceptional circumstances" which would justify such a high level of protection. The agents have made no attempt to bring themselves within the *Butz* test. They do not claim a common law immunity from suit. Indeed, they concede the well established rule that federal law enforcement officers are entitled only to qualified, or good faith, immunity. The special considerations which lead us to grant absolute immunity to a prosecutor's decision to initiate and present a criminal action are simply not present when a federal law enforcement officer is charged with constitutional violations.

---

**17.** We recognize that the primary holding in *Johnson*, that the prison warden was absolutely immune from suit, may no longer be valid. The prison warden had formulated a prison regulation which was held to violate the constitutional rights of the plaintiff. Relying on *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), we held that the warden was entitled to absolute immunity because the formulation of regulations was a discretionary act and was within the outer perimeter of his duties. As we discussed above, however, *Butz* teaches that the *Barr v. Matteo* test does not apply when the official is charged with constitutional violations. Nevertheless, to determine entitlement to absolute immunity, we analyzed the warden and the guards separately under the *Barr* test. Our implicit rejection of derivative absolute immunity survives *Butz*.

Moreover, we wish to emphasize that we have not left the FBI agents defenseless. If they acted in "good faith" in following the instructions of their superiors, then they will prevail. *See Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see also Wood v. Strickland*, 420 U.S. 308, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1975) (defining "good faith" for purpose of qualified immunity). On the other hand, if they knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty.

## VII.

We hold that the Attorney General will be absolutely immune from suit for his decision to authorize the warrantless electronic surveillances only if his decision was made in the performance of a function that is intimately related to the judicial process. We believe that a determination of the role in which the decision was made may require some inquiry into the circumstances surrounding the decision. As Justice Powell recognized, a prosecutor's quasi-judicial activities are not limited to those which take place in the courtroom. The decision to initiate a criminal prosecution, which we believe includes some limited right to gather information necessary to make that decision, is one such protected function. We are unable to determine from the record whether the district courts in *Forsyth* and *Burkhart* applied the appropriate legal test. Therefore, we must remand both cases to the district courts to conduct any additional inquiry that may be necessary and to apply the test enunciated here. Finally, we hold that the individual FBI agents are not entitled to derivative absolute immunity, and therefore, we will affirm the district courts on that issue.

Each side shall bear its own costs.