Ronald S. SCHIEB, Plaintiff,

v.

HUMANE SOCIETY OF HURON VALLEY, a Michigan Corporation, Susan J. Schurman, B.I.A./B. Investigative Agency, a/k/a B.I.A. Investigative Agency, William H. Breide II, Lema Miller, Jr., a/k/a Ricky Johnson, William Henry Timberlake, Jr., a/k/a Jason Ware, Nancy Wright, Tim Greyhavens, a/k/a Chicken Tom, Michigan State Police, Tyrone Mitchell, Roy Anderson, D.H. Overmyer Telecasting Corporation, an Ohio Corporation, being a Debtor in possession, d/b/a WDHO-TV, Channel 24, Toledo, Ohio, William F. Delhey, Prosecuting Attorney, Washtenaw County, Michigan, James Sexsmith, Assistant Prosecuting Attorney, Washtenaw County, Michigan, jointly and severally, Defendants.

Gayton LAWRENCE, Garris Lawrence, and Ernest C. Syers, Jr., Plaintiffs,

v.

HUMANE SOCIETY OF HURON VALLEY, a Michigan Corporation, Susan J. Schurman, B.I.A./B. Investigative Agency, a/k/a B.I.A. Investigative Agency, William H. Breide II, Lema Miller, Jr., a/k/a Ricky Johnson, William Henry Timberlake, Jr., a/k/a Jason Ware, Nancy Wright, Tim Greyhavens, a/k/a Chicken Tom, Michigan State Police, Tyrone Mitchell, Roy Anderson, D.H. Overmyer Telecasting Corporation, an Ohio Corporation, being a Debtor in possession, d/b/a WDHO-TV, Channel 24, Toledo, Ohio, William F. Delhey, Prosecuting Attorney, Washtenaw County, Michigan, James Sexsmith, Assistant Prosecuting Attorney, Washtenaw County, Michigan, jointly and severally, Defendants.

Civ. A. Nos. 83–CV–6433–AA, 83–CV–6434–AA.

United States District Court, E.D. Michigan, S.D.

March 19, 1984.

Roy Ashmall, Ypsilanti, Mich., for plaintiff.

Edward R. Stein, O'Brien, Moran & Stein, Ann Arbor, Mich., Thomas C. Johnson, Asst. Atty. Gen., Lansing, Mich., Eugene V. Douvan, Susan J. Schurman, Douvan & Barnett, Ann Arbor, Mich., Barry M. Kelman, Gofrank & Kelman, Southfield, Mich., David A. King, Asst. Prosecuting Atty., Ann Arbor, Mich., Kirk W. Tabbey, Smith, Poplar, Kalis & Pepper, Dearborn, Mich., Kevin Duffy, Parks, Eisele, Bates & Wilsman, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

These are companion cases which have been consolidated by stipulation of the parties. Defendants William Delhey and James Sexsmith, the Prosecuting Attorney and Assistant Prosecuting Attorney for Washtenaw County, respectively, have moved this Court to dismiss the claims against them. Plaintiffs have voluntarily dismissed their claims against Mr. Sexsmith since the filing of those motions. Defendants B.I.A./B. Investigative Agency, William Breide, Lema Miller, William Timberlake, and Nancy Wright have also moved for dismissal of the charges against them. For the reasons stated herein, all pending motions are hereby granted, and the civil rights claims against the foregoing defendants are dismissed with prejudice, the pendent state claims without prejudice.

## FACTS

Plaintiffs have alleged in these actions that they were the victims of an elaborate conspiracy conducted by various law enforcement officials, including the defendant prosecutors and certain Michigan state troopers, who acted in concert with a number of private persons and organizations, including the Humane Society of Huron Valley and several of its agents, and defendants B.I.A./B., its proprietor Mr. Breide, and the employees named above. In brief summary, plaintiffs allege that defendants Humane Society and B.I.A./B. entered into an agreement by which the latter would conduct an investigation into suspected dog fighting in the area. The Humane Society procured a house in rural Washtenaw County, and B.I.A./B. procured and installed "dogfighting equipment" at the house. B.I.A./B. and its agents subsequently conducted a number of dog fights, and consulted with the defendant William Delhey and certain officers of the Michigan State Police about their activities. A couple of the B.I.A./B. operatives made the acquaintance of plaintiffs and encouraged them to attend a dog fight scheduled for November 28, 1981. The dog fights were conducted under covert surveillance by the Michigan state troopers, acting pursuant to a search warrant issued for the premises at which the dog fights were held. At the conclusion of the dog fights, plaintiffs were arrested and charged with the misdemeanor of attending a dog fight, in violation of M.C.L.A. § 750.-49.

The charges were dismissed by the Honorable Kenneth Bronson, Fourteenth Judicial District of Michigan, on the grounds that the behavior of the law enforcement officials constituted entrapment under Michigan's "objective test" for entrapment.

Plaintiffs have brought these actions, alleging violation of their fourth, fifth, eighth, ninth, and fourteenth amendment

rights as secured under the federal constitution. The federal constitutional claims were asserted against all defendants under 42 U.S.C. §§ 1981, 1983, and 1985(3).[1] Plaintiffs have also brought state law claims for false arrest and imprisonment, malicious prosecution, and intentional infliction of emotional distress against all defendants.

The only allegation against prosecutor Delhey is that "the Humane Society and B.I.A. consulted with and advised Delhey of plans to conduct dog fights."

## THE SCOPE OF PROSECUTORIAL IMMUNITY

■ The judicially fashioned doctrine of immunity has a bifurcate nature. "Absolute immunity" from civil liability in actions alleging violations of federal civil rights has been conferred upon legislators, *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); the President of the United States, *Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); judges, *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); and witnesses in a criminal proceeding, *Briscoe v. Lahue*, — U.S. ——, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983). "Qualified immunity" is available to other public officials who are named as defendants in civil rights suits, including governors and other executive officials of a state, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and Presidential aides, *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). One court has described the difference between these two forms of immunity as follows:

> The first, absolute immunity, bars a suit at the outset and frees the defendant official of any obligation to justify his actions. The second, qualified immunity, is in the nature of an affirmative defense and protects an official from liability only if he can show that his actions did not contravene clearly established statutory or constitutional rights of

which a reasonable person in his position should have known.
> *Gray v. Bell*, 712 F.2d 490, 495–496 (D.C. Cir.1983), U.S.App.Pndg.

In *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) the Court had occasion to consider the kind of immunity available to public prosecutors who were named as defendants in § 1983 actions. Plaintiff in *Imbler* brought a § 1983 action against a state prosecuting attorney, alleging that the latter had knowingly used false information and suppressed exculpatory evidence during plaintiff's criminal trial. After reviewing the history of official immunity at common law, and the development of the doctrine with respect to actions brought under § 1983 against other kinds of state officials, the Court concluded that a state prosecuting attorney was absolutely immune from civil liability in a § 1983 action for "initiating a prosecution and in presenting the State's case," *id.* at 431, 96 S.Ct. at 995. The Court expressly reserved the question of whether absolute or qualified immunity would apply to "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative office rather than that of advocate," *id.* at 430–31, 96 S.Ct. at 995.

Since the decision in *Imbler*, a number of the Courts of Appeal have sought to answer the question left open by *Imbler*, i.e. whether public prosecutors were absolutely immune for their official activities other than those undertaken in furtherance of their advocacy function, or what has been described as their "quasi-judicial" role, *Gray v. Bell*, *supra* 712 F.2d at 499. Some courts have concluded that only qualified immunity is available to the prosecutor performing an investigative or administrative, as opposed to a "quasi-judicial" function, *see e.g. McSurley v. McClellan*, 697 F.2d 309, 318–20 (D.C.Cir.1982) (prosecutor's participation in public meetings for the purpose of preventing plaintiffs from disseminating ideas, preparation of arrest and search warrants, participation in a raid on

---

1. Plaintiffs have subsequently voluntarily dismissed their claims under 42 U.S.C. §§ 1981   and 1985(3), leaving only the § 1983 claims as a basis for federal jurisdiction in these actions.

plaintiffs' home, and transfer of documents to Senate Subcommittee not quasi-judicial activities, and not protected by absolute immunity); *Coleman v. Turpen,* 697 F.2d 1341 (10th Cir.1982) (participation in illegal sale of seized property not quasi-judicial function); *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980) *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981) (participation in an illegal search not quasi-judicial). Still another court, while adhering to the distinction between quasi-judicial and investigative functions, has recognized that:

> (T)he decision of the Attorney General, or a prosecuting attorney, to initiate a prosecution is not made in a vacuum. On occasion, the securing of additional information may be necessary before an informed decision can be made.... We hold only that to the extent that the securing of information is necessary to a prosecutor's decision to initiate a criminal prosecution, it is encompassed within the protected, quasi-judicial immunity afforded to the decision itself.

*Forsyth v. Kleindienst,* 599 F.2d 1203, 1215 (3d Cir.1979) *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). *See also Simons v. Bellinger,* 643 F.2d 774, 784 (D.C.Cir.1980) (prosecutorial activity is absolutely immune when it becomes focused upon "a particular criminal proceeding"). Still other courts have recognized the difficulty of the functional approach, and "expressed frustration with the rigidity of the analysis," *Gray v. Bell,* 712 F.2d at 499, n. 21. *See also Briggs v. Goodwin,* 569 F.2d 10, 21 (D.C.Cir.1977)

*cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978) ("To some extent ... assignment of a particular incident to one of several abstract categories is likely to involve an element of arbitrariness"). *See generally* Note, *Supplementing the Functional Test of Prosecutorial Immunity,* 34 Stan.L.Rev. 487 (1982).

The Court of Appeals for the Sixth Circuit, however, has interpreted the scope of absolute prosecutorial immunity broadly, holding that "a public prosecutor is absolutely immune from a claim for damages based upon his official actions performed within the scope of his duties," *Johnson v. Granholm,* 662 F.2d 449, 450 (6th Cir.1981) *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1332 (1982). *Cf. Keating v. Martin,* 638 F.2d 1121, 1122 (8th Cir.1980) (prosecutors absolutely immune "so long as the actions complained of appear to be within the scope of prosecutorial duties"). The Court of Appeals seems to have withdrawn somewhat from the broad statement in *Granholm,* stating recently:

> While it is settled that prosecutors are entitled to absolute immunity when initiating and pursuing a criminal prosecution, *Imbler v. Pachtman,* 424 U.S. 409 [96 S.Ct. 984, 47 L.Ed.2d 128] (1976), it is also clear that prosecutorial functions not "intimately associated with the judicial phase of the criminal process," 424 U.S. at 430 [96 S.Ct. at 995], obviate the supporting rationale for absolute immunity in favor of qualified immunity.

*Campbell v. Patterson,* 724 F.2d 41 at 43 (6th Cir.1983).[2]

**2.** Plaintiffs in *Campbell* sued the Attorney General of Michigan, the Oakland County Prosecutor, and several of the latter's assistants, for their actions which resulted in the denial of plaintiffs' release from prison by parole officials. Upon learning that plaintiffs were eligible for parole, the local prosecutors contacted the Attorney General's office, and requested an official opinion on the availability of parole for plaintiffs, who had been sentenced under Michigan's Habitual Offender Statute, M.C.L.A. § 769.12. The Attorney General rendered an opinion that plaintiffs as habitual offenders were not eligible for parole on the basis of "good time" credits, which opinion later was rejected by the Michigan Court of Appeals.

The District Court granted the dispositive motions of all defendants, concluding that the Attorney General was absolutely immune from civil liability for his actions, and that the local prosecutors were entitled to summary judgment on grounds unrelated to the issue of immunity. The Court of Appeals affirmed in part and reversed in part. The Court agreed that the Attorney General, who had a statutory obligation to render opinions interpreting state law at the request of state agencies, was absolutely immune from liability. The Court reasoned that the Attorney General was acting in a "quasi-judicial" role of interpreting state law, and was entitled to the kind of absolute immunity that

The earlier opinion of *Walker v. Cahalan,* 542 F.2d 681 (6th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1647, 52 L.Ed.2d 357 (1977), is also instructive. Following reversal of plaintiff's criminal conviction on collateral attack, the defendant prosecutor wrote a letter to a committee of the Michigan House of Representatives that was considering a bill to provide reimbursement to plaintiff for his wrongful incarceration. The letter stated that plaintiff had been correctly convicted, and that the legislature should not "commit the final perversion of stating that a guilty man is innocent."

The District Court had dismissed plaintiff's § 1983 claim on the grounds of absolute prosecutorial immunity. The Court of Appeals reversed, reasoning:

> In the instant case, an order of *nolle prosequi* had been entered as to the murder charge against Lee Dell Walker. Therefore, with nothing currently before the court, we find it difficult to ascribe any judicial or quasi-judicial significance to the prosecutor's letter. Rather, we agree with the district court that sending the letter to the legislature and releasing it to the press was within the scope of the prosecutor's general powers. The good faith of Cahalan in doing so would be a defense, *see, Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683 [1692], 40 L.Ed.2d 90 (1974), but because a question of fact was raised by the pleadings, appellant should have been afforded an opportunity to prove that the prosecutor acted with malice.

542 F.2d at 685.

## DISCUSSION

In the instant case, it is accepted for the purpose of this motion that the defendant Delhey consulted with certain private persons in furtherance of a scheme to illegally entrap the plaintiffs. The Court concludes that defendant Delhey is absolutely immune from civil liability for allegations of federal constitutional rights as a result of this conduct.

The act of consulting with law enforcement officials and public persons who may take an active role in the enforcement of law is not the kind of conduct that falls easily within the functional analysis adopted by a number of post-*Imbler* courts. The prosecutor who gives legal advice to the police is neither making the decision to charge or not to charge a suspect with a criminal offense, nor is he actively engaged in the investigation process at this point, which is the collection of factual information relating to a suspected crime. Rather, he is serving as a legal counselor for other law enforcement officials, in a role similar to that undertaken by the Attorney General when he is called upon to render an official opinion for other state officials. His role is "quasi-judicial" in the same sense that the Attorney General's role was found to be quasi-judicial in *Campbell,* although the prosecutor in this case was not required by statute to render a binding legal opinion which would guide the behavior of other public actors. The prosecutor's interpretation of the state's laws involved in *Campbell* is more akin to the role of a judge than it is to the quasi-judicial conduct found in *Imbler,* which involves the prosecutor's role as an advocate of the public interest in bringing criminal charges and making the state's case.

We glean from the cases a desire on the part of the courts to protect those activities of the prosecutor that implicate his skills as a lawyer, *see Goldschmidt v. Patchett,* 686 F.2d 582, 585 (7th Cir.1982) (prosecutor absolutely immune for sending a letter to plaintiff warning him that his conduct might have violated state law). The decision of whether or not to charge involves a delicate balancing of, not only the facts of a given case that inform the issue of proba-

protects judges, citing *Pierson v. Ray, supra.* The Court remanded the claim against the prosecutors for consideration, *inter alia,* of whether those defendants were entitled to absolute or only qualified immunity, stating that only those

prosecutorial functions "intimately associated with the judicial phase of the criminal process" were covered by absolute immunity, quoting *Imbler,* 424 U.S. at 430, 96 S.Ct. at 995.

ble cause, but also a number of policy considerations, such as the heinousness of the crime, the criminal records, if any, of the suspect, the likelihood of sustaining the government's burden at trial, and the amount of resources that the prosecutor will have to devote to this particular case, *see generally* Uviller, *The Virtuous Prosecutor in Quest of an Ethical Standard: Guidance from the A.B.A.*, 71 Mich.L.Rev. 1145 (1973); Davis, *Discretionary Justice* (1969). Our criminal justice system has seen fit to leave these difficult decisions in the purview of the public prosecutor, and thereby entrusts in him a tremendous power to adversely affect the lives of our citizenry. This system contemplates that persons who will ultimately be found innocent of wrongdoing will nonetheless be forced to defend themselves against criminal charges, and thereby incur substantial expenses and damage to their reputations, even if acquitted. It is the recognition of this power which we entrust in the prosecutor, with its concomitant potential for arousing the wrath of persons who feel that they have been wrongly charged, that has compelled the courts to confer absolute immunity upon prosecutors for their activities in this sphere.[3]

Likewise, the giving of legal advice to police and other persons engaged in the business of law enforcement is a task which the prosecutor is best situated to undertake, given his legal training and his formal ties with the police. Because there is a strong public policy encouraging the prosecutor to give such legal advice to police engaged in new and potentially problematic methods of law enforcement, without the fear that such counseling will later impose upon the prosecutor the hardship of being hailed into court as a defendant in a civil case, the Court concludes that such activity is the kind which should be protected by absolute immunity, in furtherance of the policies underlying *Imbler* and its progeny.

■■■ Even if the activity of the prosecutor in this instance is viewed as a part of the investigation of criminal activity, and the functional analysis called into play, the Court still concludes that absolute immunity is appropriate in this case. The Court would conclude that any pre-charging activities of the prosecutor, the obvious purpose of which is to inform the decision of the prosecutor whether or not to institute criminal proceedings, is covered by the umbrella of absolute immunity.

As the Courts of Appeal for the Third and District of Columbia Circuits have recognized, the identification of the point in time when a prosecutor has decided to press criminal charges can be an exercise in judicial guesswork, *see Forsyth v. Kleindienst, supra; Briggs v. Goodwin, supra*. Those courts have therefore indicated that once a prosecutorial investigation focuses upon the conduct of particular defendants against whom criminal charges will be brought, and departs from a dragnet type investigation in which the identities of criminal suspects are sought, the protection of absolute immunity will be conferred.

The problem with that "modified functional analysis" is that it will necessitate the same kind of judicial guesswork implicit in the traditional rule from which those

---

**3.** The *Imbler* Court recognized that adoption of absolute immunity "leave(s) the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest conduct deprives him of liberty," 424 U.S. at 427, 96 S.Ct. at 993. Nonetheless, the Court found that absolute immunity was the appropriate solution in striking the balance between the individual's interest in personal redress for wrongs committed against him and society's interest in the vigorous prosecution of criminal offenses:

The affording of only a qualified immunity to the prosecutor also could have an adverse effect upon the functioning of the criminal justice system. Attaining the system's goal of accurately determining guilt or innocence requires that both the prosecution and defense have wide discretion in the conduct of trial and the presentation of evidence. The veracity of witnesses in criminal cases frequently is subject to doubt before and after they testify, as is illustrated by the history of the case. If prosecutors were hampered in exercising their judgment as to the use of such witnesses by concern about resulting personal liability, the triers of fact in criminal cases often would be denied relevant evidence.

*Id.* at 426, 96 S.Ct. at 993.

courts have departed. Specifically, the question of when the prosecutor narrows the range of suspects from an indeterminate number of unknown persons to a determinate number of known persons is as elusive as the question of when the prosecutor decides to file charges. The decisions in the mind of the prosecutor are no doubt complicated ones, informed by a host of facts, many of which may militate in favor of alternative choices. The discharge of the prosecutor's duties to enforce the criminal law is too important an endeavor to be hamstrung by judicial efforts to read the prosecutor's mind.

The *Imbler* Court focused its attention upon the prosecutor's decision to bring charges or not, and the conduct of a criminal prosecution once the charges were brought. Several decisions from the Courts of Appeal have recognized that a rigid distinction between advocacy and investigative functions was impractical and somewhat disingenuous, inasmuch as those functions are inextricably intertwined in the mind of the prosecutor. This Court believes that a further dissection of investigative activities between "pre-decision to charge" and "post-decision to charge", or "pre-selection of a target" and "post-selection of a target" is equally unwise. Fair and effective enforcement of the criminal laws is furthered by encouraging the prosecutor to explore, as fully as possible, all available sources of information prior to making a determination about whether to proceed to prosecution, to refrain from prosecution, or to dismiss a prosecution improvidently brought. The rules that govern the prosecutor's conduct, including the rules that govern his/her amenability to a civil suit for damages, should be structured in such a way as to encourage the fullest exploration of relevant facts prior to making the decision to charge.

By focusing on the chronological stage of the prosecutor's activities, rather than on his subjective state of mind, the Court believes that it fulfills the dual function of advancing the policy goals underlying the *Imbler* decision and creating a workable test for determining when absolute or qualified immunity is available to a defendant prosecutor in a civil rights action. Any activity which occurs prior to the bringing of criminal charges, the obvious purpose of which is to inform the decision of whether or not to charge, would be protected. Thus, such activities as interviewing witnesses, consulting with police, or even as here, taking part in the formulation of an operation to ascertain the identity of persons inclined to violate the criminal laws have as their obvious purpose the accumulation of information concerning the potential criminal liability of suspects. The prosecutor must be free to engage in this kind of activity if he is to faithfully discharge his duty to vigorously enforce the criminal laws.

Such a rule, of course, is fully consistent with the decision in *Walker v. Cahalan.* In that case, the activities of the defendant prosecutor could not possibly have been undertaken in furtherance of informing the decision to charge or not, because the criminal charges had been dismissed against the plaintiff at the time that the allegedly libelous letter was written.[4]

Finally, even if the prosecutor was not entitled to absolute immunity, but only qualified immunity for his conduct in this case, the charges against him are still properly dismissed at this stage, for the reason that plaintiffs have failed to state a claim under 42 U.S.C. § 1983, as is discussed below in connection with the motions brought by the private defendants.

**4.** The Court in *Campbell* remanded the issue of the scope of prosecutorial immunity to which defendants were entitled in that case. Even assuming that the court below finds that the defendants were entitled to only qualified immunity, there is no conflict with the decision in this case. The activities in *Campbell* were undertaken after the plaintiffs had been charged, convicted, sentenced, and imprisoned. Obviously, the act of consulting with the Attorney General concerning the availability of plaintiffs' rights to early release on parole could not possibly have been undertaken in the furtherance of informing the decision of whether or not to bring criminal charges.

## THE PRIVATE DEFENDANTS

The moving private defendants urge three grounds for dismissal of Count II against them: failure to allege their personal involvement in the entrapment scheme; failure to show state action; and failure to show violation of enumerated constitutional rights. Because the Court concludes that plaintiffs have in fact failed to demonstrate that any of their constitutional rights have been violated by any of the defendants in this case, it does not address the previous two arguments.

Plaintiffs' complaint, at its core, alleges that certain of their enumerated constitutional rights were violated when they were entrapped and prosecuted. This Court has previously dismissed the § 1983 claims against the defendant state troopers on the grounds that a claim of entrapment does not state a cause of action under 42 U.S.C. § 1983, *see Jones v. Bombeck*, 375 F.2d 737 (3d Cir.1967); *Johnston v. National Broadcasting Company, Inc.*, 356 F.Supp. 904 (E.D.N.Y.1973). Although the Supreme Court has vigorously debated the foundation of the entrapment defense, particularly whether entrapment constitutes a defense because its successful assertion deprives the government of proof of the requisite criminal intent, or because it implicates government conduct which cannot be tolerated under the due process clause, *see Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), the Court has finally determined that the defense of entrapment is not constitutionally based, *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973):

> While we may some day be presented with a situation in which conduct of law enforcement agents is so outrageous

that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183] (1952), the instant case is distinctly not of that breed.

■ Plaintiffs point out that Michigan has adopted the entrapment test espoused by Justice Stewart in his dissenting opinion in *Russell*, in which the focus is upon the conduct of the police, rather than upon the propensity of the defendant to commit the crime, *People v. Turner*, 390 Mich. 7, 210 N.W.2d 336 (1973). The Court assumes that the determination by the state court that plaintiffs herein were entrapped on charges of violating Michigan law was made on the basis of the "objective test" of entrapment espoused by Justice Stewart in *Russell* and adopted by the Michigan Supreme Court in *Turner*. Assuming further for the sake of argument that Michigan's entrapment defense is constitutionally based, a person does not state a cause of action under 42 U.S.C. § 1983 by alleging that the conduct of defendants constituted a violation of state constitutional law, *Smith v. Sullivan*, 611 F.2d 1039, 1045 (5th Cir.1980). Rather, § 1983, by its terms,[5] provides a private remedy only for the violation of federal constitutional and statutory rights. As the discussion above indicates, there is no federal constitutional right to be free from entrapment.

■ Plaintiffs have argued that their claim should not necessarily be restricted to one of entrapment. Rather, they argue that the conduct of the defendants was such as to deprive them of fourth, fifth, eighth, ninth and fourteenth amendment rights. There being no allegations of actions taken under color of federal law, there can be no

---

5. The familiar terms of the civil rights statute provide:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immu-

nities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

violation of plaintiffs' fifth amendment right of due process in this case, *cf. Junior Chamber of Commerce of Kansas City, Mo. v. Missouri State Junior Chamber of Commerce*, 508 F.2d 1031 (8th Cir.1975).

■ Further, there being no allegation that plaintiffs were ever convicted of a criminal offense and punished for that offense, there can be no transgression of the eighth amendment's prohibition against cruel and unusual punishment, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

■ With respect to their fourth amendment claim, plaintiffs allege that they were subjected to an unreasonable seizure by various defendants when they were arrested, because the arresting officers knew or should have known that they had committed no crime. The basis for this argument would appear to be that, even if an arresting officer has probable cause to believe that a person has committed a crime, the arrest is unreasonable if a later judicial determination is made that the suspect has been entrapped. The Court concludes as a matter of law that a police officer who arrests a suspect because that person has committed an offense in the plain view of the officer (in this case, attending an illegal dog fight) has not violated the fourth amendment because it is later determined that the suspect was entrapped. The duty of the police officer is to arrest those persons whom he has probable cause to believe have committed an offense. The police officer's on the spot determination of probable cause, in order to pass constitutional muster under the fourth amendment as the basis for a "reasonable" arrest, need not take into consideration the arcane question of whether or not the circumstances of the suspect's participation in the alleged crime amounted to entrapment.[6]

■ Insofar as the plaintiffs have alleged a violation of their constitutional right to privacy, as that right has been construed by the courts as arising under several of the enumerated provisions of the Bill of Rights, *see Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), by videotaping the activities of the plaintiffs during the dog fights and subsequently causing those videotapes to be broadcast by a local television station, the Court again finds a failure to state a claim. As the Supreme Court noted in *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976):

> (R)eputation alone, apart from some more tangible interests such as employment, is (n)either "liberty" (n)or "property" sufficient to invoke the procedural protection of the Due Process Clause.

For the foregoing reasons, the claims against the defendants B.I.A./B. Investigative Agency, William Breide, Lema Miller, William Timberlake, and Nancy Wright for violation of constitutional rights brought under 42 U.S.C. § 1983 are hereby dismissed with prejudice.

### THE PENDENT STATE CLAIMS

■ Because all the federal claims against the prosecutor and the moving private defendants have been dismissed prior to trial, the Court hereby dismisses the pendent state claims against those defendants without prejudice, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Kurz v. State of Michigan*, 548 F.2d 172, 175 (6th Cir.) *cert. denied*, 434 U.S. 972, 98 S.Ct. 526, 54 L.Ed.2d 462 (1977).

SO ORDERED.

---

**6.** The moving defendants argue in this case that they had no personal involvement in the arrest of plaintiffs during the dog fight, but that plaintiffs were arrested by police officers acting pursuant to warrant. The Court reiterates that it expresses no view on the question of whether or not the conduct of these defendants was so inextricably mixed with that of public officials to create "state action" on the part of these defendants, or whether the conduct of these defendants caused or contributed to the arrest of plaintiffs to such a degree that it would be fair to say that defendants were personally involved in the alleged violation of plaintiffs' fourth amendment rights.